SOMMERYILLE, J.
This is a suit for $2,819.70 balance, alleged to be due under a certain contract entered into between plaintiff and defendant, involving over $14,000. The averments of the petition are that on February 18, 1906, the defendant and the Chatwin Bros. & Clegg Sand & Riprap Company, the assignor of plaintiff, entered into a certain contract whereby plaintiff agreed to do certain bank protection work on the Red river at “Shreves Island,” for the price of $4.50 per foot; the execution of the work to be in accordance with the terms and conditions of the contract, and the payment by the defendant of $11,278.80, four-fifths of the value of the said work, and the retention by the defendant of the remaining 20 per cent, due under the contract aforesaid for a limited time. The supplemental petition avers that the contract shows that the work was to be done under the Anchor Riprap system; that this system has been used most successfully for preventing or checking caving banks; that the defendant had inquired into and knew of the merits of this system; and that the chief engineer of defendant was so well satisfied with it that he had recommended it to various other railroads.
Defendant admits in its answer the execution of the contract, the amount of work alleged to have been done, and the payment of four-fifths of the amount provided therefor by the contract. It then avers that the remaining one-fifth was to be retained by it as security for the guaranty of the plaintiff to -fully perform its obligations under the said contract and that the work would stand the test provided for; that in June, 1907, it became apparent that the work was deficient, and notification thereof was given to plaintiff, which notice was ignored; that finally, in November, 1907, defendant, in order to protect its track, made the needed repairs at an expense largely in excess of the balance held by it.
The case went to trial on the issues thus raised, and resulted in a judgment for defendant. Plaintiff appeals.
The provisions of the contract, on which defendant relies, read as follows:
“(1) In consideration of said work being duly performed and completed to the satisfaction of the chief engineer of said railway company and by said chief engineer accepted, said railway company agrees to pay to the second party, Chatwin Bros, and Clegg Sand and Riprap Company, Incorporated, four dollars and fifty cents ($4.50) a foot, lineal measure, as aforesaid, less one-fifth of said amount, which shall be retained by said railway company as security for the guaranty of said Chatwin Bros, and Clegg Sand and Riprap Company, Incorporated, that they will have built and replaced any work which the high water or caving bank may displace or carry away, and said money so retained.shall not be paid until February 15, *1084 1908, and if the work so done should not stand the test of high water, then the money thus held shall be used by the party of the first part in making such repairs as may be necessary for damage sustained by high water, provided the party of the second part shall fail to make such necessary repairs after due notice from the party of the first part, then party of the first part shall not be liable for said one-fifth of said contract price. It is further agreed that in the event of there being hivh water in Red river prior to the 15th day of February, 1908, sufficient to test the character of said work, and it is demonstrated that the work has stood the strain in a satisfactory manner of high water at, say, twenty-eight feet on the gauge at Shreveport, then the railway company will, within thirty days, from the subsidence of said water, pay to Chatwin Bros, and Clegg Sand and Rip-rap Company the 20 per cent, retained. It is also agreed that in case there is no high water in the Red river prior to February 15, 1908, which would make a fair test of the said protection work, then in that event the period of final settlement will be extended to July 1, 1908.
“(2) Said Chatwin Bros, and Clegg Sand and Riprap Company, Incorporated, in the event of any caving or washing away of the bank between the points undertaken to be revetted, agrees to put in work to remedy said break or caving in, so as to leave said bank in good and solid condition until February 15, 1908, and to make any repairs that may be necessary to be done until February 15, 1908, the expiration of this contract, at their own expense.”
The contract sued upon had for its object the doing of certain bank protection work on Red river in Caddo parish, south of Shreveport, at what is known as Shreves Island; by the use of the “Anchor Riprap System,” a patented method, formerly known as the “Neale System,” of which the plaintiff company has the exclusive right to use in the territory of the United States south of the line running east and west through the city of St. Louis, Mo.
The system, as shown by the record, has been used in about 20 places in this section of the country, for bank protection work on silt-bearing streams, with some considerable success; and it has received the recommendation of several estimable engineers, shown by the record. Among them is the chief engineer of the defendant company, who spoke favorably of it to others.
L. Lynch, chief engineer of the St. Louis Southwestern Railway Company, testified, in part, as follows, concerning the Anchor Rip-rap system:
“I am familiar with the David Neale system of bank protection. * * « My opinion of the system, based on the work above referred to as executed by David Neale and the Chatwin Company (work done at four places for the St. Louis Southwestern Railway Company) is that it is an ingenious and economical method of river bank protection without the use of rock for the purpose of riprapping; that is to say, in silt-bearing streams where the hollow cells are utilized to collect and hold the silt, which results in sinking and anchoring the fascines and brush work in place; the main trouble I have observed being the tendency of eddy currents forming on the downstream side of dykes in high water which has a tendency to cause erosion and caving of bank below the dykes under certain conditions.”
It is further testified that the fascines are anchored to the shore with cables; and that the dykes, which are built out into the current, check, or deaden, the river. There is thus produced a tendency to throw water back upstream by virtue of the force of the current against the dykes. This water causes the sand and silt to form a bar, and, when this bar is formed, the current is thrown on the opposite shore.
The bend in the river at Shreves Island is very abrupt, the bank is a caving one, and several dykes were required for the work there. It was described by one witness as a difficult proposition to handle. That the work done by plaintiff had the effect of throwing the current from the shore at Shreves Island is testified to by several witnesses; and that condition in the river is shown in the photographs which were offered in evidence on the trial. The photographs also show a gradual slope of the bank, which is not usual in connection with caving banks; the latter are usually perpendicular. It further appears from the evidence that the. throwing of the current to the opposite bank, away from the dykes, causes a bar and de-. posit to form, and the banks obtain a slope;. *1086 and in that way the bank of the river is protected.
When the railway company originally laid the tracks on Shreves Island, the line of tracks1 was 1,500 or 1,600 feet from the river. At the time of entering into the contract sued upon, there were about 174 feet between the tracks and the river. The object of the contract was to stop the caving, if possible.
O. C. Jackson, a planter who lives close to defendant’s road on Shreves Island, and whose plantation was threatened by the caving of the sainé bank, testified as follows:
“When the Chatwins, or their company, began work there, the river bank was caving badly. A few days before they began work 1 was there on the river with one of the railroad surveyors, and from about 4 o’clock p. m. to 8 :30 a. m. the next morning, the bank had caved 64 feet. This was at the nearest point to the railroad. The bank was a rapidly caving bank at the time, and just before the Chatwins began work.” “So rapid was the caving and so friable and sandy was the bank along there that I did not presume the caving could be checked, and I so expressed myself at the time to various people in the neighborhood, and to Mr. Hillman, whom I understood was a T. & P. railroad engineer.” “I did not think the® current could be checked before it reached the railroad tracks, and said so at the time. I refer to the T. & P. railroad tracks along there. The sandy and friable condition of the banks and the swift current in the river infringing on the banks was why I held this view.”
The “work being performed and completed to the satisfaction of the chief engineer of the said railway company, and by said chief engineer accepted,” the railway company paid to the plaintiff the contract price in accordance with their agreement — that is, four-fifths of said contract price — and reserved one-fifth under the terms of the contract, “as security for the guaranty of said Ohatwin Brothers & Clegg Sand & Riprap Company, Incorporated, that they will have built and replaced any work which the high water or caving bank may displace or carry away.” It is this one-fifth balance which was reserved by defendant that is sued for in this case.
High water came in the summer of 1907, but not to the 28-foot mark on the guage at Shreveport, stipulated for in the agreement. Only a 27-foot rise was registered on said guage. During this1 rise, plaintiffs were on the work, and spent between $2,000 and $3,000 in making repairs. At that time, plaintiff and the chief engineer of the defendant company disagreed as to the nature and extent of repairs to be done on the work.
B. S. Wathen, chief engineer of the defendant company, apparently changed his mind with reference to the work, after the four-fifths of the contract price had been paid; for he testified, in part, as follows:
“It looked satisfactory at the time the last estimate was paid for; after that, a rise came along and showed that the work was very defective. * * * One end rested on the bank, and they (the fascines) were built out into the stream, and secured to the shore by cable; but they were never built anything like as large and strong as they should have been; with the result that the water would whip around the end of that back tow, and continue to scour the bank right below them. If they had been built properly and long enough out into the river, they would have served the purpose for which they were built, and that was the condition I found when I went there in June, 1907. They were almost ready to be washed away then, unless there was some more work done on them.”
More work was done on them by plaintiff in the summer of 1907, and Maj. Wathen still remained unsatisfied. The summer flood of 1907 passed, and the work of plaintiff was there; but, in the opinion of Maj. Wathen, it would not stand another rise in the river, of perhaps greater proportions. He called upon the plaintiff to do more work, without specifying the nature or the extent of that work. His communications with plaintiff were by letter. The latter answered, asking that he come on the work and indicate what he desired to have done; but he neglected to meet plaintiff’s representatives. And in November, 1907, he took the work out of the hands of plaintiff, and did some repair work thereon himself.
*1088 Plaintiff argues that this action on the part of defendant relieved it from all responsibility and liability for deterioration of the work, for the cost of the work done by defendant, and for any loss resulting from subsequent rises in the river.
The evidence contained in the record with reference to the effectiveness of the work done by the defendant railway company in the way of repairs and protection is very conflicting. We are persuaded that it is exactly the kind of work which Maj. Wathen desired plaintiff to do, and which plaintiff refused to do, for the reason that it was not in accordance with the system built by it; and that it would not serve any good purpose. Plaintiff wrote, under date November 2, 1907, in part, as follows:
“We have also put in a dyke to stop the caving where the caving was near the railway company’s right of way, and we think we have fulfilled our part of the contract to the present date, by doing everything that appeared to be necessary; and if you proceed to do more work at this place we will not be responsible for it, and we will not consent for you to pay for the same out of the one-fifth of our contract price, and we request that you arrange to have the remaining one-fifth of said contract price forwarded to us. If you do not do any work there we will watch the work, and if any of the work gets displaced, or when any repairs are necessary, we will go there and do anything which our contract calls for.”
Maj. Wathen appeared to be apprehensive that the work would not stand a further test of high water, and he wrote to plaintiff, November 4th, as follows:
“We have no faith in the work at Shreves Island holding if left in its present condition, and so believing we have decided not to take any further chances on the work, and we think it necessary to prevent the line being cut in two.”
And he did the repair work before referred to; thus taking the work out of plaintiff’s hands. And he testified that, in his opinion, a thousand feet of the bank would have gone, if he had not made the repairs which he had deemed to be necessary.
The flood of 190S has come and gone, and so has most of the repair work done by defendant; while the work of plaintiff is still intact, the river bank has been held; and the track of the defendant company is where it was originally laid.
That there was some slight caving of the bank after defendant -took charge of the work, and thus relieved plaintiff from all responsibility, is very clear; but, under the circumstances, the railway company, under the contract, could not legally anticipate and declare that the work done by plaintiff would not hold the river bank. Plaintiff originally contracted, and it subsequently agreed by letter, to do all the work necessary to hold the embankment; and if any of the work washed away, or there was real danger of its being washed away, plaintiff was there and ‘ready to repair it. And, inasmuch as the action of the defendant’s representative prevented plaintiff from thus complying with its contract, the latter is not responsible for the washing of the embankment to the small extent that it was washed away; and it is entitled to receive the contract price for its work.
The testimony shows that additions to the work would probably have been necessary after the fascines placed in position by plaintiff had finally settled; these conditions cannot be considered as impairing the effectiveness of the dykes, as originally planned. Mr. Keene, a competent engineer, testified, on this point, as follows:
“In my opinion, the caving was arrested by dykes constructed by Ohatwin Bros. If the dykes had not been constructed, it is my opinion that the banks would have caved much further than they have, because the construction of the dyke diverted the current from the banks. Otherwise, undermining of the banks' would have continued, and there would have been nothing to prevent the caving continuing indefinitely. * * * It should be understood, however, that on all such work it would probably be necessary to make some little additions after the work finally settled and these conditions would not be considered as in any way impair *1090 ing the effectiveness of the dykes as originally planned.”
There is other evidence in the record to the same effect, from witnesses of equal standing with Mr. Keene; and there is a preponderance of evidence to the effect that the work done by plaintiff at Shreves Island has accomplished its purpose, and that it was in good order when the railway company took it out of plaintiff’s hands.
The case presents questions of fact almost entirely. Most of the witnesses for plaintiff are men of education and of high rank in their respective fields of employment; while most of the witnesses for defendant are employes of that company. All of these matters will be taken into consideration in weighing the evidence and in coming to a decision. The record contains photographs, maps, and blueprints which also go to sustain the testimony of plaintiff’s witnesses. Lykiardopoulo v. New Orleans C. R. & Light Co., 127 La. 318, 53 South. 578.
The work was “performed and completed to the satisfaction of the chief engineer of said railway company, and by said chief engineer accepted,” and four-fifths of the contract price was paid by defendant to plaintiff, all in accordance with the terms of the contract. The remaining one-fifth of the contract price now in contest was “retained by said railway company as security for the guaranty of plaintiff that it will have built and replaced any work which the high water or caving bank may displace or carry away.”
.We are of the opinion that the plaintiffs have done all that the contract required of them up to the time that the work was taken from them by defendant; and that they were willing, and expressed that willingness ■ to defendant, to continue work under the contract, and to do all that might have been required of them m the future. Defendant , was without authority to take the contract from plaintiff and refuse to pay the balance of the price.
It is therefore ordered, adjudged, and decreed that the judgment appealed from is reversed; and that there be judgment in favor of plaintiff and against defendant in the sum of $2,819.70 with legal interest from July 1, 1908; with costs in both courts.